## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **CINDY KLAASSEN,** | : | |
| **Plaintiff** | : | **Civil Action No. 1:06-CV-930** |
| | : | |
| **v.** | : | **(Chief Judge Kane)** |
| | : | |
| **ALLSTATE CAFETERIA PLAN,** | : | |
| **Defendant** | : | |

### <u>MEMORANDUM</u>

Plaintiff seeks to recover long-term-disability benefits allegedly owed to her under a plan governed by the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 <u>et seq.</u>  Before the Court are cross-motions for summary judgment, which are ripe for disposition.  For the following reasons, the Court will grant summary judgment in favor of Plaintiff and deny summary judgment for Defendant.

### I.   BACKGROUND

#### A.   Factual Background[1]

Beginning in July 1984, Plaintiff Cindy Klaassen began working as a Staff/Casualty Claims Representative for Allstate Insurance Co. ("Allstate").  While employed at Allstate, in 1994, Klaassen was diagnosed with multiple sclerosis ("MS").  Klaassen began working at home, and then began working part-time in 2001, but she remained at Allstate until February 26, 2003. On that day, Klaassen called her physician to complain of fatigue, eye pain, numbness in her left arm, and difficulty walking.  Her physician, Dr. Todd Samuels, advised her not to work for a month.  On February 27, 2003, Klaassen did not return to work.  She has not returned to work

---

[1] The following facts are not in dispute for the purposes of summary judgment.

1

since that time.

Under an employee benefits plan ("Plan") maintained by Allstate and administered and insured by the Hartford Life and Accident Insurance Company ("Hartford"), Klaassen was eligible to apply for long-term-disability ("LTD") benefits.  The Plan applied a two-tier definition of "disability."  For the first two years after a claim is made, a person is "disabled" if an enumerated condition prevents her "from performing one or more of the Essential Duties of [her] Occupation" and if, as a consequence, her earnings fall below a specified threshold.  After the two-year period, however, a person is "disabled" if the condition prevents her "from performing one or more of the Essential Duties of <u>Any</u> Occupation," which is defined as "an occupation for which you are qualified by education, training or experience" and that meets certain earnings-potential requirements.  (A.R. 17)[2] (emphasis added).  The Plan also provided Hartford with "full discretion and authority to determine eligibility for benefits and to construe and interpret all terms and provisions of [the Plan.]"  (A.R. 16.)

On June 30, 2003, Klaassen applied for LTD benefits.  In her claimant questionnaire, Klaassen described her symptoms as including: "<u>extreme</u> <u>fatigue</u> & decreased concentration coupled with head pain and numbness in upper extremities"; "pain in eyes"; and "difficulty with speech and cognitive/concentration symptoms."  (A.R. 301) (emphasis in original).  Additionally, the application included a statement of continued disability filed by Dr. Samuels, in which he described Klaassen as having symptoms of "weakness, fatigue, [decreased] concentration."  (A.R. 293.)  On August 1, 2003, Hartford approved Klaassen's claim for LTD benefits and made

_____

[2] The administrative record submitted to the Court (Doc. No. 19) shall be cited in the opinion as "A.R."

her benefits effective as of July 18, 2003.

On March 10, 2004, Klaassen met with Dr. Ravi Dukkipati, a neurologist in the same group as Dr. Samuels.  Dr. Dukkipati found that "[o]verall, [Klaassen] is stable.  She continues to experience varied symptoms including fatigue, left upper extremity and lower extremity paresthesias, occipital neuralgia, dizziness, and spine parathesias, i.e. Lhermitte's phenomenon . . . Her headaches have increased somewhat since her last visit here."  (A.R. 254.) A few months later, on July 9, 2004, Klaassen returned for a follow-up appointment with Dr. Dukkipati, who again found that "[o]verall, [Klaassen] is stable.  Fatigue continues to be a fluctuating issue.  She also described paresthesias in varied locations and headaches."  (A.R. 230.)

On August 6, 2004, Hartford requested that Dr. Dukkipati answer certain questions related to Klaassen's medical condition.  On August 19, 2004, Dr. Dukkipati returned the completed form document, in which he stated that Klaassen had MS and related symptoms, that an MRI showed a finding of stable MS, that Klaassen had "chronic symptoms & episodic relapses," and that Klaassen is "not able to work."  (A.R. 238-39.)  On August 30, 2004, Klaassen completed a second claimant questionnaire, in which she indicated that her condition remained the same as in June 2003.

On November 16, 2004, Klaassen again returned for another follow-up appointment with Dr. Dukkipati, who found that "[c]linically, [Klaassen] has been doing quite well.  She continues to have fatigue as before.  It is no worse.  She reported intermittent headaches.  Her left sided symptoms are about the same."  (A.R. 232.)

On February 17, 2005, Hartford requested that Klaassen complete and return additional

3

information to evaluate eligibility for ongoing benefits.  Klaassen accordingly submitted a third

questionnaire on March 10, 2005, in which she indicated that "[t]he symptoms and [her]

condition seem to be at about the same level as per [her] 6/30/03 response and [her] 8/31/04

response to Hartford's inquiries/requests for Info." (A.R. 215.)

On March 15, 2005, Klaassen returned for another follow-up appointment with Dr.

Dukkipati.  Again, Dr. Dukkipati indicated that "[o]verall, [Klaassen] has been stable." (A.R.

126.)  Dr. Dukkipati also indicated that "[t]he holidays were tough on her in terms of increased

stress and aggravation of her underlying MS symptoms.  She denied any new symptoms.  Her

current symptoms include fatigue, headaches once a week, lower extremity weakness

intermittently, and dizziness." (Id.)

On April 18, 2005, at the request of Hartford, Dr. Dukkipati returned a form statement of

continued disability in which he indicated that Klaassen's condition was "unchanged." (A.R.

204.)  Dr. Dukkipati also indicated that Klaassen's ability to stand, walk, sit, lift, reach, push,

pull, and drive was limited. (A.R. 205.)  Finally, he indicated that Klaassen could occasionally

lift 1-10 pounds, drive, reach, handle, finger, and feel with both hands. (A.R. 206-07.)

In a letter dated June 6, 2005, Hartford requested that Dr. Dukkipati respond to the

following inquiry:

> **Do you agree, based on an 8 hour workday, that Ms. Klaassen
> retains the capacity to perform at the following level of
> functionality?**
>
> She is able to sit 1-3 hours at a time with the ability to get up and
> stretch or change positions. She is able to perform occasional
> standing or walking (1-2 hours total per workday). No repetitive
> kneeling, crouching, stooping, reaching overhead, climbing stairs,
> twisting or turning. She is able to perform repetitive lifting, carrying,

4

pushing or pulling greater than 10 pounds occasionally. She is able to use her upper extremities to perform frequent to constant fingering, feeling and/ or handling. She is able to sit at a table or desk with her arms supported on the arms of a chair or on a table.

She is able to stand and/or walk longer than 2 to 3 hours at a time with the ability to change positions. She can perform occasional sitting (1-2 hours total per workday). No repetitive kneeling, crouching, stooping, reaching overhead, climbing stairs, twisting or turning.  She has ability to perform lifting, carrying, pushing or pulling up to 20 pounds occasionally and up to 10 pounds frequently. The patient can perform frequent to constant fingering, feeling and/ or handling with her bilateral upper extremities.

(A.R. 197-98.)  On July 5, 2005, Dr. Dukkipati returned the letter to Hartford with his signature after both statements (hereinafter, "the July 5th letter").[3]  A week later, Dr. Dukkipati again observed Klaassen, and again described her as "stable."  (A.R. 127.)  However, he noted that the "increased heat of the summer tends to make her more susceptible to her chronic MS symptoms. She reported intermittent occipital pain as well as diffuse paresthesias.  She otherwise denied any difficulties."  (Id.)

On July 20, 2005, Hartford conducted an employability analysis ("EA") based upon Klaassen's work-history forms on file and the July 5th letter.  (A.R. 170.)  As a result of the EA, Hartford concluded that Klaassen could perform the following three occupations: "168.267-014: Claim Examiner, Sedentary"; "241.137-018: Supervisor, Claim"; and "241.267-018: Claim Examiner, Sedentary."  (A.R. 170A.)

On August 1, 2005, Hartford terminated Klaassen's LTD benefits.  (A.R. 166-69.)  In the

---

[3] The letter is ambiguous as to whether Dr. Dukkipati agreed to the statement contained in the second paragraph (beginning with "She is able to stand and/or walk longer than 2 to 3 hours at a time with the ability to change positions.").  After the first paragraph, Dr. Dukkipati checked that he "agree[d] with the restrictions and limitations provided."  (A.R. 197.)  However, the second paragraph did not provide an opportunity to agree or disagree.

termination letter, Hartford stated that it had "determined based on the review of the medical records and your statements that you have the ability to perform full time sedentary demand work." (A.R. 167.)  Additionally, the letter described the EA report's findings and asserted that "all evidence obtained and listed above, supports that you no longer meet the definition of disability as defined in your policy as of July 18, 2005 and your file has been closed." (A.R. 168.)  Hartford concluded that Klaassen's condition did not prevent her from performing the essential duties of a sedentary occupation and she consequently was not "disabled" as defined by the Plan.

On August 26, 2005, Klaassen appealed Hartford's decision to deny her ongoing LTD benefits.  As part of her appeal, Klaassen included personal notes, a detailed memorandum responding to specific statements in the termination letter, and a letter prepared by Dr. Dukkipati on August 10, 2005, in which he stated the following:

> Ms. Klaassen has been a patient of our practice since June of 1994. She is a 44 year old woman who has a longstanding history of multiple sclerosis.  She has been on long term disability due to the multiple sclerosis specifically.   Her symptoms of fatigue, paresthesias, decreased concentration and muscle weakness prevent her from being gainfully employed.
>
> At this time I believe, based on an eight hour workday, that Ms. Klaassen is unable to sit even for 1-3 hours at a time and work. Because of her multiple sclerosis-related symptoms, she is unable to perform even sedentary activities in a workplace type of situation.  I do not believe she is able to return to work at this time.

(A.R. 159) (hereinafter, the "August 10th letter").

On October 11, 2005, Hartford sought an independent medical review ("IMR") of Klaassen's claims.  Hartford's referral asked the reviewer to determine, among other things, the

extent to which Klaassen is "impaired from fatigue or how she is prevented from sitting and

performing a sedentary occupation." (A.R. 125.) The IMR was conducted by Dr. Roger Blair.

The administrative record contains two documents submitted by Dr. Blair: (1) a memorial

of a phone conversation between Dr. Blair and Dr. Dukkipati and (2) Dr. Blair's report of his

findings. Dr. Blair summarized his phone conversation with Dr. Dukkipati as follows:

> You noted that you have been caring for her for about a year and a
> half and that you had picked her up from one of your partners who is
> no longer working. You noted that she did have multiple sclerosis
> and that her major problems associated with multiple sclerosis were
> headache, fatigue, neck and low back pain. You also noted that she
> walks with a cane and that you have never seen use her use a wheelchair.
> You noted that she has some mild incoordination, but her limiting
> factor is extreme fatigue. She is taking Adderall for the fatigue that
> has been helpful, but still she is symptomatic from her fatigue. You
> noted that she does not have any cognitive deficits. In addition, she
> does not have any bladder dysfunction, vision dysfunction or
> diplopia. Since you had been seeing her for the past year and a half
> you would say there have been no overall changes in her medical
> condition, either better or worse. You believe that her fatigue is real
> and not emotionally based.
>
> You noted that for a short time she is able to sit and stand and walk
> and has no speech deficits or vision deficits. You believe that her
> fatigue, however, is limiting her ability to perform work on a
> competitive and persistent basis.

(A.R. 119-20.)

In his report, Dr. Blair opined that Klaassen's "condition and functional ability from

February 28th 2003 through the present is that she can participate in a sedentary work

classification." (A.R. 117.) In reaching his conclusion, Dr. Blair relied on the phone

conversation with Dr. Dukkipati, as well as his independent review of Klaassen's medical

records. According to Dr. Blair, the "medical records provided are relatively scanty and do not

include any neurological examination, spinal cord assessment, evoked potential assessment or

MRI scans of the cervical or thoracic spine." (A.R. 117.) Dr. Blair agreed, however, that "it is

reasonable to assume that the diagnosis of multiple sclerosis is indeed correct." (Id.) Dr. Blair

then wrote that "[b]ased on the medical records reviewed and on my conversation with Dr.

Dukkipati there do not appear to be any significant physical impairments which would preclude

the claimant from working in a sedentary position eight hours a day 40 hours a week." (Id.) Dr.

Blair explained that

> [Klaassen] has no cognitive difficulties noted by Dr. Dukkipati. She
> does not have any vision changes, bladder dysfunction or significant
> weakness in her arms or legs. He does not document any spasticity
> in her arms or legs. . . . There is nothing in her records that seems to
> preclude the claimant from sitting or handling or fingering or feeling
> or reaching. Unfortunately, the medical records overall are relatively
> sparse with regard to clinical examinations over the past few years.
> Nevertheless, there is nothing in the medical records that would
> preclude the claimant from participating in a sedentary job position
> eight hours a day on a 40-hour a week basis.

(Id.) Dr. Blair's report also stated, however, that Klaassen's "reports of fatigue may or may not

be consistent with the clinical findings. Unfortunately, fatigue is difficult to quantify on clinical

examination or imaging testing." (A.R. 118.) Dr. Blair further suggested that Dr. Dukkipati

"misunderstood [the July 5th letter] regarding the claimant's ability to work. His feeling is that

fatigue is her limiting factor in performing work activities." (A.R. 118.) Yet, Dr. Blair reiterated

his conclusion that "I do not believe that the claimant has been physically precluded from

performing a sedentary occupation beyond July 5, 2005." (Id.)

On November 15, 2005, Hartford notified Klaassen of its final decision to deny her LTD

benefits based upon its determination that she "possess[ed] the ability to perform a sedentary

level occupation." (A.R. 113.)  In the letter explaining its decision, Hartford briefly summarized

its previous termination letter, the subsequent appeal, and Dr. Blair's IMR findings that Klaassen

had no physical impairments on her ability to perform the essential duties of a sedentary

occupation.  The letter then explained that:

> As noted in the report by Dr. Blair, fatigue can be difficult to
> quantify.  While you may have fatigue, simply being fatigued does
> not automatically qualify an individual for Disability.  Review of the
> medical records show symptoms of severe fatigue early on in the
> record, however fatigue is later noted only as an ongoing symptom,
> and the medical record does not indicate any significant limitations
> due to fatigue.  At this time we do not have any supporting
> documentation that would support that you are Disabled due to
> fatigue.  Further, Dr. Dukkipati was unable to provide any
> information to Dr. Blair in their phone conversation which would
> support that you are significantly limited by fatigue at this time.

(A.R. 113.)  The letter further stated that "[t]he Employability Analysis completed July 20, 2005

identifies occupations which you are capable of performing.  Moreover, they are within the

physical restrictions agreed to by your physician and exceed the earnings requirement under the

policy.  Therefore, the evidence on file shows that you are capable of performing Any

Occupation."  (Id.)  Finally, the letter stated that "[b]ased the contractual provisions of The

Allstate Corporation Long Term Disability Policy, as well as the findings of your physician and

the vocational information on file, we find no evidence to support Disability from Any

Occupation."  (Id.)

## B.      Procedural Background

On May 5, 2006, Klaassen filed a complaint against Allstate[4] in this Court seeking to

---

[4] In the original complaint, Klaassen identified the defendant in the caption as "Group
Long Term Disability Plan for Employees of Allstate Insurance Company Associates, Ltd."
(Doc. No. 1.)  By stipulation of the parties, the caption was amended to refer to the defendant as

recover LTD benefits pursuant to § 502(a)(1)(B) of ERISA, 29 U.S.C. § 1132(a)(1)(B). (Doc.

No. 1.) On July 5, 2006, Allstate filed an answer to the complaint. (Doc. No. 9.) On December

11, 2006, the parties filed cross-motions for summary judgment pursuant to Federal Rule of Civil

Procedure 56 (Doc. Nos. 18, 23), and submitted briefs in support of the motions together with

accompanying documents. (Doc. Nos. 19-22, 24-25.) The parties then filed briefs in opposition

to the motions (Doc. Nos. 28-33) and reply briefs (Doc. Nos. 34-37.) The cross-motions for

summary judgment are accordingly ripe for disposition.

## II.     STANDARD OF REVIEW

### A.     Summary Judgment standard

Federal Rule of Civil Procedure 56 provides that summary judgment is proper when "the

pleadings, depositions, answers to interrogatories, and admissions on file, together with the

affidavits, if any, show that there is no genuine issue as to any material fact and that the moving

party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56; Anderson v. Liberty

Lobby, Inc., 477 U.S. 242, 248-51 (1986). When deciding a motion for summary judgment, the

Court views the facts in the light most favorable to the nonmoving party, who is "entitled to

every reasonable inference that can be drawn from the record." Merkle v. Upper Dublin Sch.

Dist., 211 F.3d 782, 788 (3d Cir. 2000). However, the nonmoving party may not simply sit back

and rest on the allegations in the complaint, but must "go beyond the pleadings and by her own

affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate

specific facts showing that there is a genuine issue for trial." Celotex Corp. v. Catrett, 477 U.S.

317, 324 (1986) (internal quotations omitted). Summary judgment should be granted where a

"Allstate Cafeteria Plan." (Doc. No. 6.)

party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial." Id. at 322.  The appropriate standard for summary judgment does not change by virtue of cross-motions being presented. United States v. Hall, 730 F. Supp. 646, 648 (M.D. Pa. 1990).

**B.      Review of ERISA benefits denial**

On its face, ERISA does not specify the appropriate standard by which courts should review eligibility decisions.  The Supreme Court has held, however, that the standard of review should be "guided by principles of trust law," Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 111 (1989), and that denial of benefits should generally be reviewed under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the benefits of the plan," id. at 115.  When discretion is afforded by the plan, a court must review eligibility decisions under an arbitrary and capricious standard.  Abnathya v. Hoffman-La Roche Inc., 2 F.3d 40, 45 (3d Cir. 1993).

Under the arbitrary and capricious standard of review, a court should not overturn an administrator's eligibility decision unless it is "without reason, unsupported by substantial evidence, or erroneous as a matter of law."  Id.  Within this circuit, however, it is recognized that "when an insurance company both funds and administers [ERISA plan] benefits, it is generally acting under a conflict [of interest] that warrants a heightened form of the arbitrary and capricious standard of review."  Pinto v. Reliance Standard Life Ins. Co., 214 F.3d 377, 378 (3d Cir. 2000).  To tailor the standard of review to the inherent structural conflict of interest, the Third Circuit has adopted a "sliding scale" approach, which requires district courts to "consider the nature and degree of apparent conflicts with a view to shaping . . . review of the benefits

11

determinations of discretionary decisionmakers." Id. at 393.  The factors to be considered when deciding how much deference to afford an administrator's decision (the Pinto factors) include: "the sophistication of the parties, the information accessible to the parties, and the exact financial arrangement between the insurer and the company," id. at 392, as well as the "current status of the fiduciary," id.  Finally, heightened scrutiny is warranted when there is "demonstrated procedural irregularity, bias, or unfairness in the review of the claimant's application for benefits." Kosiba v. Merck & Co., 384 F.3d 58, 66 (3d Cir. 2004).

In this case, it is agreed that a heightened arbitrary and capricious standard of review is appropriate because Hartford both funds and administers the plan at issue.  (Def's Br. in Opp'n 17.)  The parties do not agree, however, as to how much deference should be afforded to Hartford under a heightened review: Klaassen advocates for intense scrutiny, whereas Allstate suggests that the level of scrutiny should remain near the deferential end of the sliding scale.  Applying the Pinto factors (sophistication, information accessibility, the nature of the financial arrangements, and state of the company), the Court finds that there is no evidence that demonstrates a conflict "other than the inherent structural conflict." Lasser v. Reliance Standard Life Ins. Co., 344 F.3d 381, 385 (3d Cir. 2003).  Accordingly, the Court will review Hartford's decision by heightening the arbitrary and capricious "slightly to accommodate what appears to be a potential, even if negligible, chance of conflict." Stratton v. E. I. DuPont de Nemours & Co., 363 F.3d 250, 255 (3d Cir. 2004).  Thus, while the record will be reviewed with a dash of skepticism, the Court will overturn Hartford's decision "only if it is clearly not supported by the evidence in the record or the administrator has failed to comply with the procedures required by the plan." Id. at 256.

III.    **DISCUSSION**

As discussed below, applying the appropriate heightened arbitrary and capricious standard of review, Hartford's decision to deny her benefits will be vacated for two reasons. First, Hartford arbitrarily and capriciously disregarded Dr. Dukkipati's statements that fatigue limited Klaassen's ability to work.  Second, the Court finds that Hartford's explanation is arbitrary and capricious because it is inconsistent with the evidence of record.

A.    **Hartford's reliance on Dr. Blair's findings and the "treating physician" rule**

As an initial matter, Klaassen argues that Hartford's decision was arbitrary and capricious because "Hartford placed more weight on a records review performed by a doctor who never examined [Klaassen] than on the opinions of [her] treating physician."  (Doc. No. 25-1, at 17.) Defendant responds, accurately, that ERISA imposes no special obligation on Hartford to credit the opinion of Dr. Dukkipati.  Indeed, the Supreme Court has expressly rejected a "treating physician" rule, holding that "courts have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician; nor may courts impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation."  Black & Decker Disability Plan v. Nord, 538 U.S. 822, 834 (2003).  Furthermore, neither party cites to any obligation in the Plan itself that would require that Hartford give any weight to Dr. Dukkipati's decision.

The Supreme Court has also made clear, however, that while ERISA does not require that a plan administrator credit a treating physician's opinion, the plan administrator may not "arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician."  Id.  Thus, even though Hartford was not required to give any special weight to Dr.

13

Dukkipati's opinion, it cannot arbitrarily disregard it.

In this case, Hartford purported to have credited Dr. Dukkipati's opinion, at least in part. Hartford specifically stated that "[b]ased on the contractual provisions of The Allstate Corporation Long Term Disability Policy, <u>as well as the findings of your physician</u> and the vocational information on file, we find no evidence to support Disability from Any Occupation." (A.R. 113) (emphasis added).  Although Hartford claimed to have expressly relied on Dr. Dukkipati's July 5th letter, Hartford made no mention of his subsequent August 10th letter, in which he stated that Klaassen was unable to work.  Furthermore, Hartford's letter is utterly silent with regard to Dr. Blair's assessment that Dr. Dukkipati misunderstood his July 5th letter. Indeed, Hartford's letter completely disregards any suggestion whatsoever that Dr. Dukkipati held the view that Klaassen would be unable to work.

Defendant now argues that "Hartford had no obligation to defer to [Dr. Dukkipati's] changed opinion."  (Doc. No. 30, at 27.)  Defendant is correct that ERISA places no obligation on the administrator to defer to a changed opinion (or to the opinion in the first place).  But, ERISA prohibits arbitrary and capricious disregard for an opinion admittedly held by the treating physician.  The correspondence between Hartford and Klaassen makes no attempt to reconcile (or even to discount) Dr. Dukkipati's stated view that fatigue prevented Klaassen from working in a sedentary occupation.  Had Hartford advanced the rationale it now advances, it would indeed be difficult to fault Hartford "for failing to give [Dr. Dukkipati's] later opinion overriding significance in the face of significant contrary evidence, including [his] earlier view."  <u>Sell v. UNUM Life Ins. Co. of Am.</u>, 2002 U.S. Dist. LEXIS 22472, at *18 (E.D. Pa. Nov. 20, 2002). Again, Hartford's decision makes no mention of the fact that Dr. Dukkipati's opinion "changed."

14

And just as the Court is not free to "substitute its own judgment for that of the defendants in determining eligibility for plan benefits," Abnathya, 2 F.3d at 45, an argument advanced for the first time in litigation, however sound, cannot be used to buttress an otherwise unjustified decision.  Cf. Pinto, 214 F.3d at 394 ("Reliance Standard gave no explanation for its rejection of this aspect of Dr. Bahler's assessment.")  Accordingly, Hartford's unjustified refusal "to credit . . . the opinions of [Klaassen's] treating physician," Nord, 538 U.S. at 834, that fatigue rendered Klaassen unable to work was arbitrary and capricious.

**B.      The evidence supporting Hartford's decision**

In addition to failing to provide a contemporaneous rationale for discrediting Dr. Dukkipati's opinion, Hartford's decision does not accurately reflect the record before it.  In the denial letter sent to Klaassen on November 15th, Hartford stated that:

> Review of the medical records show symptoms of severe fatigue early on in the record, however fatigue is later noted only as an ongoing symptom, and the medical record does not indicate any significant limitations due to fatigue.  <u>At this time we do not have any supporting documentation that would support that you are Disabled due to fatigue.</u>  Further, Dr. Dukkipati was unable to provide any information to Dr. Blair in their phone conversation which would support that you are significantly limited by fatigue at this time.

(A.R. 113) (emphasis added).  Similarly, the letter stated that "we find no evidence to support Disability from Any Occupation."  (Id.)

Contrary to Hartford's assertion that the record "does not indicate any significant limitations due to fatigue," Dr. Dukkipati's notes plainly indicate that Klaassen regularly complained of fatigue.[5]  Moreover, Dr. Dukkipati's August 10, 2005, letter stated that

---

[5] On 3/10/2004, 7/9/2004, 11/16/2004, 3/15/2005, and 7/12/2005 Dr. Dukkipati indicated that Klaassen complained of fatigue.

"fatigue . . . prevent[s] [Klaasen] from being gainfully employed."  (A.R. 128.)  Finally, Dr.

Blair's report noted that "Dr. Dukkipati did not report any significant change in the claimant's

physical condition over the last two years.  I think he misunderstood his July 5, 2005 statement

regarding the claimant's ability to work.  His feeling is that fatigue is her limiting factor in

performing work activities."  (A.R. 118) (emphasis added).  As above, whether or not there may

have been reasons to discredit such evidence, Hartford provided no such reason.  The statement

that "fatigue can be difficult to quantify" does not, by itself, wipe the record clean of the evidence

that suggests that Klaassen's fatigue was sufficiently severe to prevent her from working in a

sedentary occupation.  Significantly, the record is devoid of any evidence in conflict with Dr.

Dukkipati's opinion, as communicated to Dr. Blair, that Klaassen's "fatigue is real and not

emotionally based" (A.R. 119), such as an independent medical evaluation.[6]  The Court finds that

Hartford acted arbitrarily and capriciously by disregarding the evidence of record in denying

Klaassen's LTD benefits.  Therefore, Hartford's decision will be vacated.

## IV.    CONCLUSION

For the foregoing reasons, the Court finds that Hartford's decision to deny Klaassen's

LTD benefits was arbitrary and capricious.  Therefore, summary judgment shall be granted in

favor of Plaintiff.  An appropriate order follows.

---

[6] The Court is aware that the plan imposed no duty on Hartford to conduct an independent medical examination.  Nonetheless, when the record is viewed as a whole, there is no dispute that the only doctors to personally evaluate Klaassen (Samuels and Dukkipati) found that her fatigue substantially impaired her ability to work.  To simply read the opinions of the two medical professionals in this case out of the record without any justification beyond the bare assertion that fatigue is "difficult to quantify" is arbitrary and capricious.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **CINDY KLAASSEN,** | : | |
| **Plaintiff** | : | **Civil Action No. 1:06-CV-930** |
| | : | |
| **v.** | : | **(Chief Judge Kane)** |
| | : | |
| **ALLSTATE CAFETERIA PLAN,** | : | |
| **Defendant** | : | |

## ORDER

     **AND NOW**, on this 27th day of August, 2007, upon consideration by the Court and for the reasons set forth in the accompanying memorandum, **IT IS HEREBY ORDERED THAT**:

1.   Plaintiff's motion for summary judgment (Doc. No. 23) is **GRANTED.** It is further **ORDERED** that Plaintiff be paid long-term-disability benefits in accordance with the policy, retroactive from July 18, 2005.

2.   Defendant's motion for summary judgment (Doc. No. 18) is **DENIED**.

3.   The Joint Motion for Extension of Time on all deadlines (Doc. No. 40) is **DENIED** as moot.

4.   The Clerk of Court is directed to enter judgment in Plaintiff's favor.

                                  S/ Yvette Kane
                                    Yvette Kane, Chief Judge
                                    United States District Court
                                    Middle District of Pennsylvania